**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 1:20-cv-01640-NYW

ROBERT J. ROUSSELLE,

     Plaintiff,

v.

COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,

     Defendant.

---

**MEMORANDUM OPINION AND ORDER**

---

Magistrate Judge Nina Y. Wang

This civil action arises under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401–33, for review of the Commissioner of the Social Security Administration's ("Commissioner" or "Defendant") final decision denying Plaintiff Robert J. Rousselle's ("Plaintiff" or "Mr. Rousselle") application for Disability Insurance Benefits ("DIB"). Pursuant to the Parties' consent [Doc. 15], this civil action was referred to this Magistrate Judge for a decision on the merits. *See* [Doc. 18]; 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; D.C.COLO.LCivR 72.2. After carefully considering the Parties' briefing, the entire case file, the Administrative Record, and the applicable case law, this court respectfully **AFFIRMS** the Commissioner's decision.

**BACKGROUND**

Mr. Rousselle, born June 13, 1958, alleges he became disabled on May 23, 2016, at 57 years-of-age, due to multilevel degenerative disc disease with osteophyte. *See* [Doc. 14-6 at 160].[1]

---

[1] When citing to the Administrative Record, the court utilizes the docket number assigned by the CM/ECF system and the page number associated with the Administrative Record, found in the bottom right-hand corner of the page. For all other documents the court cites to the document and page number generated by the CM/ECF system.

Mr. Rousselle alleges he stopped working on May 23, 2016 due to his conditions and because his business, a beauty salon, "burned to the ground in an officially undetermined fire." [*Id*.]. Given his various ailments, Mr. Rousselle filed his application for DIB on January 30, 2017. [Doc. 14-5 at 141].

The Social Security Administration initially denied Plaintiff's application administratively on October 25, 2017. *See* [Doc. 14-4 at 77]. Mr. Rousselle submitted a request for a hearing before an Administrative Law Judge Kurt D. Schuman (the "ALJ") on March 26, 2019. *See* [*id*. at 84; Doc. 14-2 at 12]. At the hearing, Plaintiff testified that he completed beauty school after he separated from the Navy in March 1980. [Doc. 14-2 at 33–34]. In addition to the courses Plaintiff took in beauty school, he also took courses on creating various hairstyles, makeup, manicures, pedicures, facials, and general aspects of running a business. [*Id*. at 34]. Plaintiff owned and operated his own beauty salon for sixteen years. [*Id*. at 34–35]. Plaintiff testified that he stopped working after his beauty salon burned down on May 23, 2016. [*Id*. at 37]. After the fire, Plaintiff moved to Colorado, and he has not worked since he moved. [*Id*.].

Plaintiff testified that he was unable to work because he has "a very hard time moving," due to medical issues with his hands and back that he traces to a back injury that occurred in 1977 when he was serving in the Navy. [*Id*. at 37, 47–48]. He explained that he was unable to sit for more than 15 or 20 minutes, he has difficulty standing up from bending over to brush his teeth, and that he needed to "bend over to do somebody's hair." [*Id*.]. Mr. Rousselle reported that he had not undergone treatment for his conditions since March of 2018 because, while he attempted to do so, he claimed "nobody would recognize [he] had a problem." [*Id*. at 38]. Mr. Rouselle also

reported that he was referred to a spine surgeon but was unable to attend the referral appointment. [*Id*. at 39].[2]

With respect to daily activities, Plaintiff indicated he was able to ride a bike; and he testified that he is able to dress himself "very slow[ly]"; he experiences pain when he tries to put on socks; he lies down in the tub to soak, rather than standing in the shower; he is able to wash his hair and shave on his own; he does not cook for himself; he could not drive long distances without needing to lie down; he rarely goes to the grocery store; and he does not use a cane. [*Id*. at 39–42]. Mr. Rousselle went on to testify that his back felt strained when he worked at the beauty salon because he would need to bend over to cut clients' hair and would need to take a break to sit down after each haircut. [*Id*. at 44–45]. Mr. Rousselle explained that it would take him twice his normal amount of time to perform a perm hairstyle on a client because he would need to take breaks to "straighten out [his] back and stand up." [*Id*. at 47].

The ALJ also received testimony Vocational Expert Douglas Prutting (the "VE") at the hearing. *See* [Doc. 16-2 at 49–55]. The VE summarized Mr. Rousselle's past relevant work as a cosmetologist, a specific vocational preparation ("SVP")[3] of 6, a light job, and with an occupationally significant characteristic as an owner-operator. [*Id*. at 51; Doc. 14-6 at 211]. The VE testified that a hypothetical individual (with Plaintiff's age, education, and work experience)

---

[2] Plaintiff also testified regarding his contact dermatitis, a skin condition and also stated he could not return to his past work as a cosmetologist because he was allergic to hair dye. *See, e.g.*, [Doc. 16-2 at 44, 47–48]. However, any skin condition is not at issue in his appeal. *See generally* [Doc. 16].

[3] SVP refers to the "time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.'" *Vigil v. Colvin*, 805 F.3d 1199, 1201 n.2 (10th Cir. 2015) (citing Dictionary of Occupational Titles, App. C, Sec. II (4th ed., revised 1991)); 1991 WL 688702 (G.P.O.). The higher the SVP level, the longer time is needed to acquire the skills necessary to perform the job. Jeffrey S. Wolfe and Lisa B. Proszek, SOCIAL SECURITY DISABILITY AND THE LEGAL PROFESSION 163 (Fig. 10-8) (2003).

who could perform *medium* work—subject to an exertional limitation that he is able to frequently stoop—could perform Mr. Rousselle's past relevant work.  [Doc. 14-2 at 51].  The VE then testified that a second hypothetical individual (with Plaintiff's age, education, and work experience) who could perform *medium* work—subject to exertional limitations including occasional stooping; frequent crouching, kneeling, crawling, and frequent bilateral handling and fingering; and avoiding frequent exposure to extreme cold—could not perform Mr. Rousselle's past relevant work.  [*Id*. at 51–52].  As to transferability of skills, the VE testified that Mr. Rousselle had acquired the following skills in his past work that could be transferred to work that is either semi-skilled or skilled within his residual functional capacity: customer service, time management, problem-solving, money management, and working independently.  [*Id*. at 52].  The VE explained the foregoing skills could be transferred to the following positions: limo driver, SVP of 3, a medium job; home attendant, SVP of 3, medium job; shuttle driver, SVP of 3, medium job.  [*Id*. at 52–53].  The VE then testified that a third hypothetical individual (with Plaintiff's age, education, and work experience) who could perform *light* work, and who possesses the same transferrable skills as above, could perform the following jobs: office clerk, SVP of 3, light job; companion, SVP of 3, light job; gate guard, SVP of 3, light job.  [*Id*. at 53].  The VE concluded that if the ALJ's hypothetical individual also required (a) on average, two additional breaks each workday of a duration between 15 and 20 minutes each in addition to regularly scheduled breaks; and (b) more than two unscheduled or unexcused absences per month, there would be no work available to Plaintiff. [*Id*. at 54].

On April 16, 2019, the ALJ issued a Notice of Decision denying Plaintiff's application for DIB (the "Decision").  [Doc. 14-2 at 12–20].  The ALJ concluded the following:

1.  Mr. Rousselle had met the insured status requirements on September 30, 2018, and had not engaged in substantial gainful activity since the alleged onset date of May 23, 2016;

2.  Mr. Rousselle had the severe impairments of degenerative disc disease of the lumber, thoracic, and cervical spine, but that his carpal tunnel syndrome, ganglion cyst, and contact dermatitis were non-severe;

3.  Mr. Rousselle had no impairment or combination of impairments that met or medically equaled a listing;

4.  Mr. Rousselle had the RFC to perform medium work, subject to a limitation that he could only frequently stoop, and was capable of performing past relevant work as a cosmetologist; and

5.  Mr. Rousselle had the ability to perform other jobs that existed in the national economy.

[Doc. 14-2 at 14–20]. The ALJ determined that Mr. Rousselle was not disabled because his residual functional capacity ("RFC") permitted him to perform a range of medium work as defined in 20 C.F.R. § 404.1567(c), with a limitation to frequent stooping. [*Id.* at 15–16]. Specifically, the ALJ determined that Mr. Rousselle retained the RFC to perform work "at the medium exertional level with stooping limited to frequent, without further accommodations." [*Id.* at 18]. Though believing Mr. Rousselle's ailments could reasonably be expected to cause some of the alleged disabling symptoms, the ALJ explained that Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. [*Id.* at 16]. For instance:

- while Mr. Rousselle alleged he was unable to sit for more than 20 minutes and could not stand for long periods, "his treatment records [were] minimal" and "[i]nconsistent with his allegations";

- Mr. Rousselle reported he required no medications during his May 2017 consultative examination with Dr. Dewey; and

- apart from a March 2018 spinal MRI—which revealed "mild stenosis at the C5-6 levels, moderate disc bulges at the C4-5 level, mild stenosis at the L4-5 level, and moderate foraminal narrowing at the L3-4 level"—Mr. Rousselle's "examination findings show that his functionality has remained generally well preserved [sic]" [*id*. at 17].

The ALJ also noted that while Plaintiff reported he was unable to stand, contort, or sit for long periods, he "testified that he ceased working in May 2016 due to a fire on his work premises." [*Id*. at 16]. In assessing Plaintiff's RFC, the ALJ considered the opinions of Dr. Hynes, Dr. Dewey, Dr. Backlund, and Dr. Ruiz-Alonso. [*Id*. at 17–18].

Mr. Rousselle requested Appeals Council review of the ALJ's decision, which the Appeals Council denied on April 15, 2020, rendering the ALJ's decision the final decision of the Commissioner. [*Id*. at 1]. Mr. Rousselle sought judicial review of the Commissioner's final decision in the United States District Court for the District of Colorado on June 6, 2021. [Doc. 1]. Because this matter is ripe for consideration, I consider the Parties' arguments below.

## LEGAL STANDARDS

An individual is eligible for DIB benefits under the Act if he is insured, has not attained retirement age, has filed an application for DIB, and is under a disability as defined in the Act. 42 U.S.C. § 423(a)(1). An individual is determined to be under a disability only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The disabling impairment must last, or be expected to last, for at least 12 consecutive months. *See*

*Barnhart v. Walton*, 535 U.S. 212, 214-15 (2002).  Additionally, the claimant must prove he was disabled prior to his date last insured.  *Flaherty v. Astrue*, 515 F.3d 1067, 1069 (10th Cir. 2007).

The Commissioner has developed a five-step evaluation process for determining whether a claimant is disabled under the Act:

1.   Whether the claimant has engaged in substantial gainful activity;

2.   Whether the claimant has a medically severe impairment or combination of impairments;

3.   Whether the claimant has an impairment that meets or medically equals any listing found at Title 20, Chapter III, Part 404, Subpart P, Appendix 1;

4.   Whether the claimant has the Residual Functional Capacity ("RFC") to perform her past relevant work; and

5.   Whether the claimant can perform work that exists in the national economy, considering the claimant's RFC, age, education, and work experience.

*See* 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v).  *See also Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (describing the five steps in detail).  The RFC is what a claimant is still "functionally capable of doing on a regular and continuing basis, despite his impairments: the claimant's maximum sustained work capability." *Williams*, 844 F.2d at 751. "The claimant bears the burden of proof through step four of the analysis[,]" while the Commissioner bears the burden of proof at step five.  *Neilson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (internal quotation marks omitted).

In reviewing the Commissioner's final decision, the court limits its inquiry to whether substantial evidence supports the final decision and whether the Commissioner applied the correct legal standards.  *See Vallejo v. Berryhill*, 849 F.3d 951, 954 (10th Cir. 2017).  "Substantial

evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty*, 515 F.3d at 1070 (internal citation omitted); *accord Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992) ("Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."). "But in making this determination, [the court] cannot reweigh the evidence or substitute [its] judgment for the administrative law judge's." *Smith v. Colvin*, 821 F.3d 1264, 1266 (10th Cir. 2016).

## ANALYSIS

On appeal, Mr. Rousselle identifies three primary issues in the ALJ's decision which he argues warrant remand, *see generally* [Doc. 16 at 3]: (1) the ALJ failed to properly weigh the opinion of Dr. Bryan Hynes ("Dr. Hynes"), Plaintiff's treating physician, [*id*. at 10–22]; (2) the ALJ did not explain why the opinions of two non-examining physicians, Dr. William Backlund ("Dr. Backlund") and Dr. Ramon Ruiz-Alonso ("Dr. Ruiz-Alonso"), deserved to outweigh the opinion of Plaintiff's treating physician, [*id*. at 22–25]; and (3) the ALJ did not have valid reasons for rejecting the opinion of examining physician Dr. Michael Dewey ("Dr. Dewey"), [*id*. at 25–27]. Each of these purported errors allegedly resulted in an improper determination of the RFC by the ALJ.[4]  In response, the Commissioner argues the ALJ properly considered all the record evidence, including Plaintiff's subjective statements, and sufficiently explained and supported his reasons for his weighing of the medical source opinions and ultimate RFC findings. *See generally* [Doc. 17]. For the following reasons, I respectfully conclude that the ALJ's determination was sufficient and should be affirmed.

---

[4] While Mr. Rousselle's Opening Brief contains a section entitled "Application of Correct Legal Standards" and states that an ALJ's decision is also subject to reversal for failure to apply the correct legal test [Doc. 16 at 4–5], there does not appear to be any argument on appeal that the ALJ did not apply the correct legal test, but rather, he erred in his application of such test.

I.      **The RFC Assessment – Weighing the Medical Opinions**

In formulating a claimant's RFC, the ALJ must consider the combined effect of all the claimant's medically determinable impairments, including the severe and non-severe.  *See Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013); *Ray v. Colvin*, 657 F. App'x 733, 734 (10th Cir. 2016).  A claimant's RFC is the most work the claimant can perform, not the least.  20 C.F.R. § 404.1545; SSR 83-10.  "'The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'"  *Hendron v. Colvin*, 767 F.3d 951, 954 (10th Cir. 2014) (quoting SSR 96-8p, 1996 WL 374184, at *7 ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.")).  The ALJ need not identify "affirmative, medical evidence on the record as to each requirement of an exertional work level before an ALJ can determine RFC within that category," and the court will uphold the RFC assessment if it is consistent with the record and supported by substantial evidence.  *See Howard v. Barnhart*, 379 F.3d 945, 947, 949 (10th Cir. 2004).

In assessing a claimant's RFC, the ALJ must also address medical source opinions.  *See Vigil v. Colvin*, 805 F.3d 1199, 1201-02 (10th Cir. 2015).  For applications filed prior to March 27, 2017, the Social Security regulations afford a treating source opinion controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2); *cf. Garcia v. Colvin*, 219 F. Supp. 3d 1063, 1071 (D. Colo. 2016) ("The distinction between *not inconsistent* and *consistent* is significant.  The treating source opinions should not be accorded controlling weight if they contradict other substantial evidence in the record, but they do not

necessarily have to reach the exact same conclusions." (emphasis in original)).[5]  Generally, the opinion of an examining source is entitled to more weight than the opinion of a non-examining source.  *See Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014); 20 C.F.R. § 404.1527(c)(1). Indeed, the opinion of a treating or examining source is in no way "dismissable," *see Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012), and may be dismissed or discounted only upon an examination of the factors provided in the regulations and "specific, legitimate reasons for rejecting it[,]" *Doyal v. Barnhart*, 331 F.3d 758, 764 (10th Cir. 2003).

But even if the ALJ does not afford the treating source opinion controlling weight, the ALJ owes that opinion deference and must weigh that opinion using all the factors provided in 20 C.F.R. § 404.1527(c)(1)–(6).  *See Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); SSR 96-2p, 1996 WL 374188, at *4.  These factors include:

1.  the length of the treatment relationship and the frequency of examination;
2.  the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed;
3.  the degree to which the physician's opinion is supported by relevant evidence;
4.  consistency between the opinion and the record as a whole;
5.  whether or not the physician is a specialist in the area upon which an opinion is rendered; and
6.  other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004) (quotation marks omitted).  Ultimately, the ALJ's findings must be "sufficiently specific to make clear" the weight assigned to the treating source opinion and the reasons for that weight.  *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir.

---

[5] In 2017, the Regulations were changed to no longer "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)." 20 C.F.R. § 404.1520c(a). Because Plaintiff's claim was filed before March 27, 2017, the former regulations apply. See 20 C.F.R. § 404.1527(c)(2) ("Generally, we give more weight to medical opinions from your treating sources.").

2007) (internal quotation marks omitted); *accord Golden-Schubert v. Commissioner, SSA*, 773 F. App'x 1042, 1050 (10th Cir. 2019) ("An ALJ is not required to expressly discuss each factor in deciding what weight to give a medical opinion."). This means the ALJ must "discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Mestas v. Kijakazi*, No. 20-CV-01865-REB, 2021 WL 3030224, at *3 (D. Colo. July 19, 2021) (quoting *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996)).

## II.      Dr. Hynes

While Plaintiff contends in his Opening Brief that the ALJ "never made it clear that he had assessed entitlement to controlling weight" of Dr. Hynes' opinion, [Doc. 16 at 16], Plaintiff's Reply Brief clarifies that Plaintiff "does not challenge the [ALJ's] denial of controlling weight" to Dr. Hynes' opinion, [Doc. 19 at 3]. Rather, Plaintiff argues the ALJ did not apply all of the relevant weighing factors under 20 C.F.R. § 404.1527(c) before rejecting Dr. Hynes' opinion altogether. *See* [*id*. at 6]. Plaintiff argues it was error for the ALJ to reject Dr. Hynes' opinion "due to inconsistent evidence without considering the other relevant factors." [*Id.* at 6]; *see also* 20 C.F.R. § 404.1527(c)(1)–(6). Plaintiff argues the ALJ "did not explain the significance of relevant weighing factors," [Doc. 16 at 16], namely, (1) the length of treatment and frequency of the examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; and (4) the consistency between Dr. Hynes' opinion and the record as a whole, [*id*. at 16–22]. With respect to factors one and two, Plaintiff asserts the ALJ "did not explain why the length and frequency of treatment was a deficiency" and "did not even summarize the nature or discuss the quality of Dr. Hynes's treatment regimen in his

explanation of the weight he assigned to [Dr. Hynes'] opinion."  [*Id*. at 17–18].  Upon review of the ALJ's determination and the record before me, I respectfully disagree.

Though acknowledging Dr. Hynes as a treating source, the ALJ granted his opinions "little weight" because Dr. Hynes' opinions were "out of proportion to the medical evidence" and Plaintiff "had minimal treatment records." [Doc. 14-2 at 18].  Moreover, the ALJ explained that, while Dr. Hynes rendered a more limited opinion—finding Plaintiff incapable of even sedentary work—the ALJ discounted that opinion as inconsistent with Plaintiff's "consultative examination [with Dr. Dewey], and multiple physical examinations [which] evidence[d] a normal gait, coordination, and sensation; normal range of motion in all joints; and normal muscle and motor strength."  [*Id*.]   Based on this information, the ALJ determined that "the medical record as a whole [was] more consistent with a restriction to work at the medium exertional level with stooping limited to frequent, without further accommodations."  [*Id*.].  Thus, the ALJ afforded little weight to Dr. Hynes' opinions.  *See* [*id*.].

This articulated finding is supported by the record associated with Dr. Hynes.  The record reflects Plaintiff visited Dr. Hynes five times between January and December 2018.  *See* [Doc. 14-8 at 338–352].  At a January 31, 2018 appointment, Dr. Hynes' examination of Plaintiff revealed "[m]ultiple pressure points of the cervical, thoracic, lumbar spine and paraspinal muscles with decreased range of motion secondary to pain and stiffness," as well as joint tenderness.  [Doc. 14-8 at 349].  Dr. Hynes noted that Plaintiff's examination evidenced normal motor strength in his upper and lower extremities, and Plaintiff denied experiencing abnormalities with his coordination or gait.  [*Id*. at 349–350].  At a follow-up appointment on March 19, 2018, Dr. Hynes noted identical findings to those Plaintiff presented with at the January 31 appointment.  [*Id*. at 346–348].  Dr. Hynes also referred Plaintiff to undergo an MRI.  [*Id*.].  At Plaintiff's next appointment

with Dr. Hynes on April 24, 2018, Dr. Hynes noted that Plaintiff's spinal MRIs "showed significant changes in the cervical spine area with foramina stenosis, moderate to severe, especially on the left." [*Id*. at 344].  Plaintiff's physical examination once again revealed "[m]ultiple pressure points of the cervical, thoracic, lumbar spine and paraspinal muscles with decreased range of motion secondary to pain and stiffness" and joint tenderness.  [Doc. 14-8 at 344].

On May 22, 2018, Dr. Hynes completed a functional capacity assessment wherein he noted that Plaintiff could lift and carry ten pounds; sit, stand, and walk for 30 minutes at one time and up to two hours in an eight-hour workday; and could never stoop, squat, crawl, or kneel.  [Doc. 14-7 at 296–297].  Dr. Hynes also opined that Plaintiff would need to shift positions at will from sitting, standing, or walking; and that he would need periods to walk around; and had manipulative restrictions.  [*Id*. at 297–298].  At Plaintiff's next appointment on August 17, 2018, Dr. Hynes explained further that "MRIs of [Plaintiff's] cervical, thoracic, lumbar spine have shown significant degenerative changes, disc displacement and stenosis ranging from mild to severe of his central canal and foramen." [*Id*. at 341].  Dr. Hynes referred Plaintiff to a spinal surgeon.  [*Id*. at 342].  Finally, at Plaintiff's appointment on December 4, 2018, Dr. Hynes continued to note Plaintiff's neck and back pain consistent with the findings at Plaintiff's previous appointments. *See* [*id*. at 338–340].

"An ALJ is not required to expressly discuss each factor in deciding what weight to give a medical opinion."  *Golden-Schubert v. Commissioner, SSA*, 773 F. App'x 1042, 1050 (10th Cir. 2019).  Here, the ALJ acknowledged that Dr. Hynes was a treating physician and expressly gave Dr. Hynes' opinion little weight due to the inconsistencies described above.  This, along with the ALJ's citation to the inconsistent evidence, "satisfies the requirement that the ALJ's decision be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to

the treating source's medical opinion and the reasons for that weight." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007).

Those inconsistencies also speak directly to factors three and four—whether Dr. Hynes' opinion is (a) supported by relevant evidence and (b) consistent with the record as a whole—which Plaintiff contends the ALJ "did not consider." *See* [Doc. 16 at 16]. While Plaintiff argues "the ALJ ignored Dr. Hynes'…exam and imaging findings," [Doc. 16 at 19], the record does not support this assertion. Indeed, the ALJ specifically "notes that [Plaintiff's] March 2018 spinal MRI revealed mild stenosis at the C5-6 levels, moderate disc bulges at the C4-5 level, mild stenosis at the L4-5 level, and moderate foraminal narrowing at the L3-4 level," but determined that "[o]utside of this instance, examination findings show that [Plaintiff's] functionality remained generally well preserved." [Doc. 14-2 at 17].

Moreover, Plaintiff argues "[t]he only specific reason offered by the ALJ for rejecting Dr. Hynes's opinion is because medical records from Dr. Dewey and the emergency room" indicated other normal functional capacities, "[b]ut the ALJ did not explain why the reports of Dr. Dewey and the ER fairly define the record as a whole." [Doc. 16 at 20]. However, medical records from Dr. Dewey and the emergency room are not the only records the ALJ cited in discussing "the medical record as a whole." *See* [Doc. 14-2 at 19 (citing to "Exhibits 4F/5–6; 15F/3, 5, 12, 27–28," the records Plaintiff contends do not "fairly define the record as a whole")]. Indeed, the ALJ cites to other evidence, including Plaintiff's medical records from 2016 and Plaintiff's March 2018 MRIs. *See, e.g.*, [*id*. (citing to "Exhibits 1F–3F, 6F–8F, 14F–16F")]. Thus, this court finds no error in the ALJ's treatment of Dr. Hynes's opinion.

## III.    Drs. Backlund and Dr. Ruiz-Alonso

Mr. Rousselle next argues that the ALJ failed to articulate valid reasons for assigning "great weight" and "partial weight" to the opinions of non-treating physicians Dr. Backlund and Dr. Ruiz-Alonso, respectively. [Doc. 16 at 22–25]. The ALJ afforded Dr. Backlund's opinion "great weight," particularly the opinion that Plaintiff "could perform medium work and could frequently stoop." [Doc. 14-2 at 18].

### A.    Dr. Backlund

Dr. Backlund completed a non-examining residual functional capacity for Plaintiff on July 3, 2017 as part of Plaintiff's initial disability determination. Dr. Backlund opined that Plaintiff could occasionally lift and carry up to 50 pounds, and frequently lift and carry up to 25 pounds; sit for "[a]bout 6 hours" in an eight-hour workday; had no pushing or pulling limitations; and could stoop frequently with no other postural limitations. [Doc. 14-3 at 70–71]. The ALJ determined that Dr. Backlund's opinion was "consistent with evidence of degenerative spinal changes and examination findings of a normal gait, muscle strength, and coordination." [*Id.*]. The "evidence" of normal findings cited by the ALJ included Dr. Dewey's physical examination of Plaintiff. *Compare* [*id.* (citing to "Exhibit 4F/5–6")] *with* [Doc. 14-7 at 238–240].

### B.    Dr. Ruiz-Alonso

Medical consultant Dr. Ruiz-Alonso also completed a non-examining medical evaluation on June 19, 2018. Dr. Ruiz-Alonso opined that Plaintiff's statements regarding his functional limitations were "partially consistent" with the evidence he reviewed. [Doc. 14-7 at 290]. Dr. Ruiz-Alonso concluded it was "reasonable to assess" that Plaintiff has "a severe condition" and could lift and carry up to 50 pounds occasionally and 25 pounds frequently; stand and walk six hours; sit for six hours with normal breaks; and the evidence did not support additional limitations. [*Id.*].

The ALJ afforded Dr. Ruiz-Alonso's overall opinion "partial weight," and afforded "great weight" specifically to Dr. Ruiz-Alonso's opinion that Plaintiff "could perform medium work, with standing, walking, or sitting for six of eight hours." [Doc. 14-2 at 17].  The ALJ explained that he "weighed evidence of mild to moderate degenerative spinal changes in [Plaintiff's] lumbar spine…against evidence of a normal gait, coordination, and sensation; and normal range of motion in all joints; normal muscle and motor strength" in finding that Plaintiff was restricted to "medium work with frequent stooping."  [*Id.*].  Again, the "evidence" of normal findings cited by the ALJ included Dr. Dewey's physical examination of Plaintiff.  *Compare* [*id.* (citing to "Exhibit 4F/5–6")] *with* [Doc. 14-7 at 238–240].  Additionally, the "evidence of…spinal changes" cited by the ALJ refers to MRIs of Plaintiff's cervical spine and lumbar spine.  *Compare* [*id.* (citing to "Exhibit 8F/1-4")] *with* [Doc. 14-7 at 281–284].  Finally, the ALJ explained that he gave Dr. Ruiz-Alonso's overall opinion "partial weight" because "he did not provide for stooping limitations." [Doc. 14-2 at 17].

### C.    March 2018 MRI

Plaintiff also challenges the ALJ's reliance on the opinions of Drs. Backlund and Ruiz-Alonso because they did not review Plaintiff's March 2018 MRIs.  *See* [Doc. 16 at 23–24].  The Commissioner responds that Plaintiff has failed to show how these imaging studies render stale the opinions of Drs. Backlund and Ruiz-Alonso.  [Doc. 17 at 9].  I respectfully agree with the Commissioner.

Plaintiff's March 2018 lumbar spine MRI showed mild to moderate narrowing [Doc. 14-7 at 283–84], which is consistent with a 2016 x-ray [*id.* at 218], which the state agency doctors

reviewed, *see* [Doc. 14-7 at 294].[6]  Plaintiff's thoracic MRI showed only mild arthritis and no narrowing around the spine or nerve roots.   [*Id*. at 285].   And while a cervical MRI showed moderate to marked changes at one level, [*id*. at 281–82], Plaintiff almost never complained of neck pain.  For instance, Plaintiff did not report neck pain in 2016 [*id*. at 214–17] or to Dr. Dewey in 2017 [*id*. at 236]; he denied neck pain in February 2018 when he visited the emergency room for his mild back pain [Doc. 14-8 at 302]; and he told the ALJ that he could not work because of back pain [Doc. 14-2 at 37] and could not return to his past work as a cosmetologist because he was allergic to hair dye [*id*. at 48], not because of neck problems.  Moreover, the ALJ explained that he reviewed Plaintiff's MRIs and concluded that "[o]utside of this instance, examination findings show that his functionality has remained generally well-preserved." *See* [Doc. 14-2 at 17 (citing to the MRIs at Exhibit 8F)].

### III.    Dr. Michael Dewey

Finally, Plaintiff argues the ALJ should not have discounted the opinion of Dr. Dewey, a treating physician, while accepting the opinions of non-treating physicians Drs. Backlund and Ruiz-Alonso.  *See* [Doc. 16 at 25–27].  In response, the Commissioner asserts the ALJ's rejection of Dr. Dewey's opinion is harmless because the ALJ found Plaintiff was capable of his past relevant work as a cosmetologist, a light job, which is consistent with Dr. Dewey's opinion of Plaintiff's limitations. *See* [Doc. 17 at 8–9].  Additionally, the Commissioner asserts that "Plaintiff does not challenge Dr. Dewey's opinion."  [*Id*. at 11].  I respectfully agree with the Commissioner and find that the ALJ's treatment of Dr. Dewey's opinion is not cause for reversal.

---

[6] The agency doctor who reviewed the 2016 x-ray is Cesar Berberena, whom the ALJ referenced in his determination in support of his findings.  *See* [Doc. 14-2 at 18 ("As for the opinion evidence, the opinion of Ramon Ruiz Alonso, M.D. and confirmed by disability examiner Cesar Berberena is given partial weight.")].

First, the court respectfully disagrees that the ALJ discounted the entirety of Dr. Dewey's opinion. Plaintiff asserts the ALJ failed to consider "the kind of examination [Dr. Dewey] performed or the quality of the examination" and Dr. Dewey's opinion "deserves more weight than the nonexamining physician's opinions." [Doc. 16 at 26]. However, despite the ALJ's assigning "little weight" to Dr. Dewey's opinion [Doc. 14-2 at 17], the ALJ also cited Dr. Dewey's opinion in support of the determination that Plaintiff's statements about the limiting effects of his symptoms were inconsistent with the normal functioning revealed in his medical examinations:

> Examiner Michael Dewey, D.O. observed that the claimant was able to sit comfortably without pain mitigating movements, and that the claimant showed no signs of discomfort getting on and off the exam table. He also noted that the claimant arose spontaneously from a seated position and exhibited no guarding behaviors. The claimant also had no weakness in his extremities and maintained normal ambulation and coordination, normal range of motion in his cervical spine, and normal range of motion in his bilateral ankles, shoulders, elbows, wrists, and fingers. He also had normal motor and muscle strength in all extremities, and normal sensation.

[*Id.* (internal citations omitted); *see* Doc. 14-7 at 238–240]. Notably, the ALJ appears to have afforded "little weight" only to the "Functional Assessment" portion of Dr. Dewey's opinion, while affording a much greater, yet unspecified, amount of weight to the "Physical Exam" portions of Dr. Dewey's opinion. *Compare* [Doc. 14-2 at 17, para. 2] (stating, "examination findings show that his functionality has remained generally well preserved," and then citing only to "Exhibit 4F/4" to "4F/6," the "Physical Exam" portions of Dr. Dewey's opinion in support thereof)] *with* [*id.*, para. 4 (stating, "[t]he opinion of Michael Dewey, D.O. is given little weight," and then citing only to "Exhibit 4F/8," the "Functional Assessment" portion of Dr. Dewey's opinion)].

The ALJ's reliance on the "Physical Exam" portions of Dr. Dewey's opinion to support the ALJ's ultimate determination is demonstrated further throughout the Decision. *See, e.g.*, [Doc. 14-2 at 16 ("[R]elying on examination findings of a normal gait, coordination, and sensation; and

normal range of motion in all joints; normal muscle and motor strength… (Exhibits 4F/5–6…)")];
[*id*. at 17 ("The undersigned weighed evidence of mild to moderate degenerative spinal changes
in his cervical lumbar spine…against evidence of a normal gait, coordination, and sensation; and
normal range of motion in all joints; normal muscle and motor strength (Exhibits 4F/5–6…)")]; [*id*.
at 18 (finding the opinion of Dr. Backlund "is consistent with evidence of degenerative spinal
changes and examination findings of a normal gait, muscle strength, and coordination… (Exhibits
4F/5–6…)"].

Second, this court respectfully disagrees that the ALJ failed to articulate why he discounted
the opinion of Consultative Examiner Dr. Michael Dewey.  The ALJ afforded "little weight" to
Dr. Dewey's opinion.  [Doc. 14-2 at 17].  The ALJ explained that, while Plaintiff "has evidence
of degenerative spinal changes …, when this evidence is balanced against the claimant's preserved
functional findings, a restriction to medium work with frequent stooping is more consistent with
the evidence."  [Doc. 14-2 at 17–18].  This conclusion is borne out by the medical record.  Dr.
Dewey examined Plaintiff one time on May 20, 2017.   Dr. Dewey noted that Plaintiff
"demonstrated pain-mitigating movements" during his examination, though Plaintiff "did not
appear uncomfortable getting on and off the examination table."  [Doc. 14-7 at 238].  Dr. Dewey
observed that Plaintiff's ambulation appeared normal and symmetric.  [*Id*. at 239].  Dr. Dewey
noted that Plaintiff showed "[a]pparent discomfort" with limited ranges in his dorsolumbar flexion.
[*Id*.].  Additionally, Plaintiff's lumbar spine and accompanying paraspinal areas were "tender[] to
palpation."  [*Id*. at 240].  Dr. Dewey's diagnosis of Plaintiff included chronic low back pain and
mild to moderate lumbar spondylosis.  [*Id*. at 241–242].  Finally, Dr. Dewey completed a
functional assessment for Plaintiff wherein he opined that Plaintiff had no sitting limitations; he
could stand or walk four to six hours; lift 20 pounds frequently, and 30 pounds occasionally; carry

ten pounds frequently and 20 pounds occasionally; and occasionally balance, stoop, squat, crouch, and crawl. [*Id*. at 242].

While the court agrees with Mr. Rousselle that the record in certain instances supports the limitations in Dr Dewey's limitations, the ALJ acknowledged the opinion of Dr. Dewey as well as those that contradicted Dr. Dewey's limitations stated in the "Functional Assessment" portion of his opinion, *see* [Doc. 14-7 at 242], including Dr. Dewey's own treatment notes that revealed normal exam findings, *see* [*id*. at 238–40]. *See Barnhill-Stemley v. Colvin*, 607 F. App'x 811, 814-15 (10th Cir. 2015) ("Discrepancies between a treating physician's very restrictive functional assessment and that physician's contemporaneous treatment notes are a legitimate factor for discounting a medical opinion." (citing *White v. Barnhart*, 287 F.3d 903, 907-08 (10th Cir. 2002)). Further, it is the ALJ's (not the court's) responsibility to resolve evidentiary inconsistencies, *see Allman v. Colvin*, 813 F.3d 1326, 1333 (10th Cir. 2016), and this court may not "displace the agency's choice between two fairly conflicting views," *Zoltanski v. FAA*, 372 F.3d 1195, 1200 (10th Cir. 2004) (brackets omitted). To find otherwise would require the court to reweigh the evidence before the ALJ—something the court may not do. *See Qualls v. Apfel*, 206 F.3d 1368, 1371 (10th Cir. 2000).

Thus, I find no error with respect to the ALJ's treatment of Dr. Dewey's opinion.

## CONCLUSION

For the reasons stated herein, the court hereby **AFFIRMS** the Commissioner's final decision.

DATED:  September 22, 2021                    BY THE COURT:

                                              _____
                                              Nina Y. Wang
                                              United States Magistrate Judge